**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**TERRELL GILES,**

              **Petitioner,**                                  **04-CV-0779**

    **v.**

**MICHAEL GIAMBRUNO, Superintendent,**
             **Respondent.**
_____


## REPORT, RECOMMENDATION AND ORDER

This matter was referred to the undersigned by the Hon. William S. Skretny, in accordance with 28 U.S.C. § 636(b), for all proceedings necessary to determine the factual and legal issues presented, and preparation of a report and recommendation regarding the disposition of this petition. Dkt. #16.

Petitioner commenced this proceeding *pro se*, pursuant to 28 U.S.C. § 2254, challenging his conviction upon a plea of guilty to the charges of manslaughter in the first degree and criminal possession of a weapon in the second degree. Dkt. #1. Petitioner was sentenced to a determinate sentence of twelve years for the manslaughter conviction, a concurrent sentence of five years for the weapons charge and five years supervised release. A60.

In this petition for writ of *habeas corpus*, petitioner argues that he received ineffective assistance of counsel as a result of his attorney's failure to challenge the legality of petitioner's arrest, *to wit*, whether the police had probable cause to seize and

arrest petitioner, and counsel's failure to investigate petitioner's claim of self-defense and prior aggression by the deceased. Dkt. ##1 & 2. For the following reasons, it is recommended that the petition be denied.

## BACKGROUND

On October 8, 1999, petitioner was indicted by the Monroe County Grand Jury on charges of manslaughter in the first degree and criminal possession of a weapon in the second degree for the shooting death of Saeed Saadiq, *aka* Alton Allen, on September 2, 1999. A1.[1] At his arraignment on October 14, 1999, petitioner's counsel advised the Court that :

> My client did turn himself into the police. Was negotiated
> with his father when they found out that they were looking for
> him. He was extremely cooperative with the police. They
> have indicated that.

A1. Counsel also noted that although petitioner was charged with murder in the second degree at the time of his arrest, the grand jury returned the indictment for first degree manslaughter. T6.[2]

On November 19, 1999, the Court held a hearing regarding the voluntariness of petitioner's statement to the police. T3. As relevant to the issues currently before the Court, City of Rochester Police Officer Siersma testified that upon responding to the scene of a shooting at 29 Petrel Street, he learned that the victim had

---

[1] "A" refers to the consecutively paginated appendix.

[2] "T" refers to the transcript of proceedings, which is separately paginated by date of proceeding. Thus, T6 refers to page 6 of the transcript of proceedings of October 14, 1999.

been caring for a six-year-old boy named Terrell Giles, Jr., who was missing.  A64.

While searching for the missing boy, Officer Siersma received a message from dispatch

that the child was at his grandfather's house.  T7.  Upon arrival at the grandfather's

house, Don Giles told Officer Siersma that

> his son was the one involved in the shooting over on Petrel
> Street.  He told us that his grandson was safe, and that his
> son was on his way over to turn himself into the police.

T8-9.  Officer Siersma and his partner waited at the Giles' residence until petitioner and

his son "walked from the front of the house into the yard and up the driveway."  T30.

Officer Siersma recalled that petitioner "was holding his son's hand as they walked up

to us."  T30.  Officer Siersma further testified that petitioner  "walked into the yard with

his son, and I don't know if his father said there's Terrell now or we just assumed it was

him."  T24.


Officer Siersma handcuffed petitioner, placed him in the back of an

unmarked police car and transported him to the Public Safety Building where petitioner

was placed in an interview room, read his Miranda warnings from a pre-printed card,

and interviewed about the shooting.  T10-12.  Thereafter, Officer Siersma spoke with

petitioner's six-year-old son.  T17.  Officer Siersma questioned petitioner about

discrepancies between the petitioner's responses and his son's observation of the

incident, prompting petitioner to revise his statement.  T16-18.  Petitioner subsequently

led police to the gun and the clothes he was wearing at the time of the shooting.  T19;

A5.  Ultimately, petitioner provided the following written statement:

> Today, September 2, 1999 at around 10:00 or 11:00 am, I
> was driving on Lake Ave. near Phelps Ave. when I saw my

-3-

> son Terrell Jr. on Lake Ave all by himself. He is only six years old. I pulled over and walked over to where he was playing. . . . I asked my son who he was out on Lake Ave. with and he said no one. I told him to show me where he was living and I began walking up the side of a house with Terrell and we came out on Fulton Ave. . . . We went to the back door of the house and knocked on the door. I had a big black 357 in the waist of my pants. I was just carrying the gun. I have had the gun for months. I bought the gun from some guy on the streets. I did not plan to use the gun today, I was just carrying it. When Terrell knocked on the door a guy inside said to hold on. He came to the door and I saw that it was a guy name [sic] Clark who lives with Terrell's mother. I have had a problem with Clark in the past when he tried to back over me with his car. . . . Clark told us to come in the house and I asked Clark why Terrell was up on Lake Ave. We started having words and then Clark and I started fighting. As we were fighting, I pulled out my gun and hit him in the head once. Then the first shot went off accidentally and I don't know where the shot went. We were in the kitchen the whole time we were fighting. Clark kept coming at me and we were still fighting. I had the gun in my hand and it was pointed at him and I pulled the trigger. I think I shot Clark in the leg area. I know that I hit him somewhere low on his body because I saw the blood coming from him and there was some blood on my clothes. My son was there watching the fight and Clark getting shot. I grabbed my son and we left from the house. I went over to my car and we drove to Shamika's house and changed my clothes. . . . I heard on the news what happened to Clark and I called my dad and said I wanted to turn myself in. He called the police and I got a ride to my dad's house at 204 Bay St. and turned my self in to Inv. Siersma and Sgt. Gropp. They told me my rights and I told them what happened. I lied to them at first, but then I told them the truth. I showed them where I put the gun behind Shamika's mother's house at 289 Garson Ave. This was not suppose [sic] to happen this way. I did not go there to shoot Clark [sic] I did not even know where he was living until Terrell Jr. showed me. . . . I did wrong, I admit to that, but this wasn't suppose [sic] to be this kind of day.

A67-68. The Court determined that the statements, both oral and written, were

voluntary. T41. Trial was set for March 6, 2000. *T7 of the 10/14/99 proceedings*.

>On March 3, 2000, counsel reported to the Court that
>
>>after I left your chambers yesterday I went over to the jail. I spoke to his father first and I went over to the jail and had a rather lengthy talk with Terrell. I know Terrell had at least one, possibly two lengthy conversations with his father last night. His father called me at home around 9:30 or so and we spoke for quite a while, and I want to thank you for affording us the opportunity of allowing his father to sit and talk with us . . . this morning before court. We truly appreciate that gesture.
>>
>>Terrell's decision at this point would be to, in exchange for a plea of guilty to the two counts of the indictment, accept the Court's promise offer, which was a cap of no more than fifteen years determinate . . . and I believe it's Terrell's desire to go forward with this disposition this morning.

T3. The prosecution noted that

>this is the Court's offer. As we had stated at the pretrial conference[3] . . . the family had asked that we . . . request or seek a maximum sentence here. That is why . . . the plea will be to the entire indictment, the manslaughter and the criminal possession of a weapon.

T4.


>The Court conducted the following colloquy with petitioner:
>
>The Court:   Has anybody made any other or different promise to you in order to induce you to come to this agreement?
>
>Defendant:   No.

---

[3] The pretrial conference was scheduled for October 28, 1999. *T7 of the 10/14/99 proceedings*. At the Huntley hearing on November 19, 1999, the Court inquired whether petitioner was ready to discuss disposition of the matter, noting that "the offer was to the top count, with no sentence restriction. I gave you a promise of no more than 15 years, but maybe considerably less if the [Pre-Sentence Investigation] comes out right." T43. Counsel noted that petitioner wanted to proceed with the Huntley hearing before considering the offer. T43.

| | |
|---|---|
| The Court: | Has anybody threatened or forced you to come to this agreement today? |
| Defendant: | No. |

\* \* \*

| | |
|---|---|
| The Court: | Have you had an ample opportunity and time to discuss this with your attorney? |
| Defendant: | Yesterday and now. |

\* \* \*

| | |
|---|---|
| The Court: | Have you had enough time to talk with him about it? |
| Defendant: | Yes. |
| The Court: | And are you satisfied with his representation of you? |
| Defendant: | Yes. |

T5-7. The Court then ascertained that petitioner was aware of the rights he was giving up by choosing to plead guilty. T6-7. Thereafter, the petitioner admitted that he was in possession of a gun when he went to the victim's home, engaged in an altercation with the victim, pointed the gun at the lower portion of the victim's body and shot him, severing the femoral artery and causing the victim to bleed to death. T9-10. The Court accepted petitioner's plea of guilty to the charges of manslaughter in the first degree and criminal possession of a weapon in the second degree. T11.

At sentencing on April 27, 2000, defense counsel noted to the court that petitioner "turned himself into the police, gave them a voluntary statement, told them

what happened . . . ." T10.  Defense counsel further emphasized that

> He knows he did wrong.  He has admitted that he has done wrong.  He has been honest with the police right from the beginning.  He turned over all the evidence, including the clothes and the weapon.  He gave them the statement.  He has expressed remorse throughout the entire proceeding.  He can't take back that which he has done, and he is prepared today to be sentenced by Your Honor to whatever sentence the Court deems fit under the circumstances.

T11-12.  Defense counsel declined to comment on the factual portion of the Pre-Sentence Investigation, but the prosecution, in asking for the maximum sentence, noted that

> On this day, in the [Pre-Sentence Investigation], he relates a story that is different from what he told you in court.  He indicates that the victim lunged at him at the doorway, and he believed he had to shoot him because he feared this man carried weapons and [had] been involved in other crimes.
>
> I don't believe there is any basis or fact to that, Your Honor.  And I would like to display to the Court or have it marked as a Court exhibit, where this incident took place.  I will show the Court the blood in this apartment is in the kitchen.  This was not a brutal lunging as he knocked on the door to find out why his son was playing outside.  This is an argument that got started . . . after being allowed, we assume, into the home.
>
> * * *
>
> The defendant, although expressing remorse, taking blame, tries to paint a picture of a victim who is violent, who charged him, who did all of these bad things.  I can show you with this photograph and ballistics that is not the truth.  He beat the victim over the head.  We have pictures from the ME that show several lacerations into the victim's head.  He shot the victim in the leg and he says, "I didn't think he would die."

T7-8.

Petitioner was sentenced to a determinate sentence of twelve years for the charge of manslaughter in the first degree, a concurrent sentence of five years for the charge of criminal possession of a weapon in the second degree and five years post-release supervision. T12-13. In support of this sentence, the Court stated as follows:

> I find and I am fully satisfied that you didn't intend to kill. This is the sort of thing that happens with guns that get into the possession of people and are used in the heat of the moment.

T12.

The New York State Supreme Court, Appellate Division, Fourth Department, assigned the Monroe County Public Defender's Office to represent petitioner on appeal. A40. On appeal, counsel argued that petitioner's sentence was harsh and excessive. A42. In support of this argument, counsel stressed that, *inter alia*, "[a]fter the incident, Mr. Giles turned himself into the police." A51. By Order entered July 3, 2002, the Appellate Division, Fourth Department, affirmed the judgment of conviction without opinion. A96; *See People v. Giles*, 296 A.D.2d 873 (4th Dep't 2002). The Public Defender's Office submitted its brief, respondent's brief and petitioner's supplemental brief to the Court of Appeals in support of its letter request for permission to appeal. A97. The Court of Appeals denied permission to appeal. A130; *See People v. Giles*, 98 N.Y.2d 730 (2002).

Thereafter, petitioner learned that his supplemental brief had not been accepted by the Appellate Division, Fourth Department and moved for reargument and reconsideration.  A98.  In his supplemental brief, petitioner argued that he was deprived of his constitutional right to effective assistance of counsel, as guaranteed by the United States and New York State Constitutions, when his attorney failed to challenge the legality of his arrest.  A106.  Specifically, petitioner argued that police officers did not have probable cause to arrest him upon his arrival at his father's home because they did "not have a description of the defendant" and they "did not have a photograph to [assess] what the defendant actually looked like."  A114.   As a result, petitioner argued that his "identity was never established and that he was arrested on nothing more than a mere hunch."  A115.  The Appellate Division, Fourth Department, denied petitioner's motion by Order entered October 1, 2002.  A131; *See People v. Giles*, 747 N.Y.S.2d 851 (4th Dep't 2002).

By Notice of Motion filed December 3, 2002, petitioner, proceeding *pro se*, moved to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10(h).  A132.  In support of this motion, petitioner submitted a memorandum of law in which he argued, *inter alia*, that his attorney failed to argue that the police officers lacked probable cause to arrest him when he approached his father's residence with his son and failed to investigate potential defenses, but sought only to coerce petitioner to accept the plea bargain.  A143-146.  By Decision and Order entered June 4, 2003, the court determined that petitioner

> has made no persuasive argument, nor supplied any
> reasonable view to this court, that the outcome of these

-9-

> proceedings would have been more favorable to him, but for the alleged unprofessional errors of his trial counsel. Accordingly, the [petitioner] has not met his burden of demonstrating that Mr. Shapiro provided counsel that was ineffective or that the outcome of these proceedings would have been more favorable to the defendant, but for such alleged ineffectiveness.  It cannot be overlooked that [petitioner] received a favorable plea bargain, culminating in a term of incarceration for less than possible under statutory sentencing guidelines.
>
> While the [petitioner] asserts ineffectiveness of his trial counsel in pursuing leads provided to him concerning a justification defense, the record of the [petitioner's] plea allocution fully refutes the defense now asserted.  The defendant was asked if he was satisfied with the representation that he had received from his trial counsel in preparation for his plea, and [petitioner] responded that he was satisfied with Mr. Shapiro's representation.

A161.  Petitioner moved for leave to appeal the decision to the Appellate Division, Fourth Department, which was denied by Order entered April 7, 2004.  A163 & A232.

## DISCUSSION AND ANALYSIS

Petitioner argues that he was denied his Sixth Amendment right to effective assistance of counsel as a result of his attorney's failure to challenge the legality of petitioner's arrest, *to wit*, whether the police had probable cause to seize and arrest petitioner, and counsel's failure to investigate petitioner's claim of self-defense and prior aggression by the deceased against petitioner.  Dkt. ##1 & 2.  Specifically, petitioner argues that the police did not have probable cause to arrest him because the "only information the arresting officer had at the moment of arrest was that: (1) they received a radio transmission from their dispatcher that the child was over at his grandfather's residence . . . (2) that the arresting officers had a conversation with

petitioner's father, and petitioner's father told the officers that his son was involved in the shooting over on Petrel Street and was coming to his house to turn himself in to the police . . . . Dkt. #2, p.14.  Petitioner argues that the officers "had no description of petitioner."  Dkt. #2, p.14.  Had his attorney requested a *Dunaway*[4] hearing to challenge the lawfulness of his arrest, petitioner argues that "there is a reasonable probability that the results of the proceedings would have been different."  Dkt. #2, p.21.

Respondent argues that petitioner's guilty plea waives any challenge to the legality of his arrest.  Dkt. #8, p.7.  In any event, respondent argues that it was not ineffective assistance of counsel to fail to challenge probable cause for petitioner's arrest because the police officers had sufficient information to believe that petitioner was involved in the shooting at the time they arrested him.  Dkt. #8, p.9.  With respect to the alleged failure to investigate, respondent argues that there is no evidence to suggest that further information regarding the relationship between petitioner and the victim would have mitigated petitioner's actions.  Dkt. #8, pp.9-10.

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.[5]  He may only attack the voluntary

---

[4] *See Dunaway v. New York*, 442 U.S. 200 (1979).

[5] Although New York does provide an exception to this rule to permit appellate review and collateral attack of constitutional claims which were raised but denied prior to the guilty plea, that exception does not apply in this matter since the constitutional infirmities alleged in the petition for *habeas corpus* were not raised prior to the plea.  *See Lefkowitz v. Newsome*, 420 U.S. 283, 289 & 293 (1975).

> and intelligent character of the guilty plea by showing that the advice he received from counsel was not within

the range of competence demanded of attorneys in criminal cases. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973), *citing McMann v. Richardson*, 397 U.S. 759, 770-71 (1970). "In other words, 'the issue [is] not the merits of these [independent] claims as such, but rather whether the guilty plea had been made intelligently and voluntarily with the advice of competent counsel.'" *United States v. Coffin*, 76 F.3d 494, 497-98 (2d Cir. 1996), *quoting Tollett*, 411 U.S. at 265. Thus, a petitioner's unconditional guilty plea waives all claims of ineffective assistance of counsel relating to events prior to the guilty plea that did not affect the voluntariness of the plea. *Vasquez v. Parrott*, 397 F. Supp.2d 452, 463 (S.D.N.Y. 2005). However, the voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it," including the strength of the evidence and the potential for a more lenient sentence following the plea. *Brady v. United States*, 397 U.S. 742, 749 (1970).

"The two-part standard set forth in *Strickland v. Washington,* 466 U.S. 668 . . . (1984), for evaluating ineffective assistance of counsel claims applies in the context of guilty pleas." *Id.* at 498, *citing Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

> First, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 697-88 . . . . Second, a defendant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59 . . . .

*Id.*

In the instant case, petitioner does not argue that he did not receive effective assistance of counsel regarding his decision to plead guilty, and the record does not support any such claim. To the contrary, the record reveals that despite the prosecutor's refusal to accept anything but a plea to each charge in the indictment, trial counsel obtained a commitment from the trial judge to sentence petitioner to no more than fifteen years of prison. *T3-4 of 3/3/00 proceedings*. The record further reflects that trial counsel discussed this commitment with petitioner and his father and arranged for petitioner's father to discuss the matter with the Court. T7. Petitioner admitted his guilt under oath after a thorough review of his rights by the Court and specifically stated that he was satisfied with his attorney's representation. T3-11.

Trial counsel's strategy of presenting his client as a concerned father who lost control because his child was not being cared for properly and thereafter cooperated with the police, expressed remorse and accepted responsibility, was a sound one. In line with this strategy, the Court accepted petitioner's statement that he did not intend to kill the victim, but shot him in the heat of an argument, and sentenced him to three years less than his initial sentencing commitment. In light of petitioner's confession, the recovery of the weapon from petitioner and the presence of petitioner's child as a witness to the shooting, petitioner could not have expected any better result following trial. As a result, there is no basis to consider the merits of petitioner's claims of deficiencies in the performance of his trial counsel prior to the plea.

Even if the Court could reach petitioner's arguments, there was no basis to challenge the identification of petitioner as the suspect in the shooting or probable

cause for his arrest. Police officers were searching for the missing child, who they knew to be petitioner's son and who they knew to have been in the custody of the victim at the time of the shooting, when petitioner's father called the police to his home and informed the arresting officers that petitioner "was the one involved in the shooting . . . and that his son was on his way over to turn himself into the police." *T8-9 of 11/19/99 proceedings*. Shortly thereafter, petitioner "walked from the front of the house into the yard and up the driveway" holding hands with his six-year-old son. T30. In his statement, petitioner confirmed that he turned himself in to police officers. A67-68.

Further investigation into the relationship between petitioner and the victim would not have added anything to petitioner's defense either. The facts did not support a self defense theory and the prosecutor challenged petitioner's attempt to portray the victim as the aggressor with photographs and medical and forensic evidence. The Court accepted petitioner's contention that he "didn't intend to kill the victim," but reacted "in the heat of the moment," a finding which may well have been undermined by additional evidence of prior animosity or aggression between the parties.

In sum, the Court finds that petitioner's decision to plead guilty was knowing and voluntary and that petitioner's allegation of ineffective assistance of counsel is without merit in any event.

## **CONCLUSION**

Based on the foregoing, it is recommended that the petition for writ of *habeas corpus* be **DENIED.**

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The District Judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Judge's refusal to consider the objection.**

The Clerk is directed to send a copy of this Report, Recommendation and Order to the petitioner and the attorney for respondent.

Dated:   Buffalo, New York
         August 22, 2007

                                            S/ H. Kenneth Schroeder, Jr.
                                            **H. KENNETH SCHROEDER, JR.**
                                            **United States Magistrate Judge**